GENE M. GARDNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; AVANELL GARDNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gardner v. Commissioner
Docket Nos. 14296-80, 14297-80.
United States Tax Court
T.C. Memo 1982-542; 1982 Tax Ct. Memo LEXIS 203; 44 T.C.M. (CCH) 1168; T.C.M. (RIA) 82542; September 21, 1982. Williard A. Herbert, for the petitioners. John S. Repsis, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in the income tax of Gene M. Gardner for the calendar year 1969 in the amount of $4,025.07 and additions to tax for this year under sections 6651(a)(1) [1] and 6653(a) *204 in the amounts of $1,006.27 and $201.25, respectively, and a deficiency in the income tax of Avanell Gardner for the calendar year 1969 in the amount of $3,893.07 and additions to tax under sections 6651(a)(1), 6653(a), and 6654, in the amounts of $973.27, $214.02, and $124.58, respectively. Respondent also determined additions to tax under section 6653(a) against Avanell Gardner for the calendar years 1967, 1968, 1970, 1971, and 1972 in the amounts of $29.40, $27.23, $118.63, $218.69, and $19.85, respectively. The issues for decision are: (1) whether Gene M. Gardner received income in the amount of $25,306.42 which was community income of Gene M. Gardner and Avanell Gardner in the year 1969 which he did not report by virtue of a deposit made into his bank account; (2) whether Gene M. Gardner is liable for the additions to tax under sections 6651(a)(1) and 6653(a) for the calendar year 1969; (3) whether petitioner Avanell Gardner is liable for the additions to tax under sections 6651(a)(1), 6653(a) and 6654 for the year 1969 and additions to tax under section 6653(a) for the years 1967, 1968, 1970, 1971, and 1972. *205 FINDINGS OF FACT At the time of the filing of his petition in this case, Gene M. Gardner resided in Duncan, Oklahoma, and at the time of the filing of her petition in this case, Avanell Gardner resided in Dallas, Texas. During the years 1967 through 1972, Gene M. Gardner and Avanell Gardner were husband and wife residing in Dallas, Texas. Neither Mr. Gardner nor Mrs. Gardner filed a Federal income tax return for any of the years 1967 through 1972. Gene M. Gardner is a lawyer and has been admitted to practice law in the State of Texas since 1954. In 1967, he was employed by A. C. Swords, Jr., who owned a construction company called Swords Company, and by Messrs. C. R. and C. F. Leatherwood who owned a linen company, City Linen Services, to arrange for a merger or consolidation of the companies and for the stock of the resulting company to be publicly offered as a marketable security. Mr. Gardner worked on this project during the years 1967 and 1968 and completed all the details of the merger in 1969. He was the vice president and general counsel of the successor merged entity which was a corporation, Gulf Continental, Inc. The stock of Gulf Continental, Inc., traded on *206 the over-the-counter market. The president of the merged company, Gulf Continental, Inc., was Mr. Swords. The chairman of the board was Mr. C. F. Leatherwood and the secretary of Gulf Continental, Inc., was Mr. C. R. Leatherwood. In 1969, Mr. C. F. Leatherwood and Mr. Swords on behalf of Gulf Continental, Inc., negotiated a loan transaction with Carl S. Burrows, Mr. Ford, and Mr. Hoover. The arrangement was that Mr. Burrows would borrow $150,000, using as collateral stock of Gulf Continental, Inc. The stock of Gulf Continental, Inc., which was to be used as collateral for the loan, was held by the company. Each of the controlling stockholders of the company, including Mr. Gardner, had contributed to this corporation approximately 20 percent of his stock holdings to form a fund to be used for employee bonuses, for collateral for loans to assist the corporation, and in acquisition of assets. The stock that each of the stockholders contributed to the corporation was still held in the individual's name although it had been contributed to the corporation to be used for the purposes indicated. The loan transaction which Mr. Burrows was to arrange was to be partially for the benefit *207 of the major stockholders consisting of Mr. Gardner, Mr. Swords, and Mr. C. F. Leatherwood and partially for the benefit of the corporation. Mr. Burrows at the time was president of the City Bank & Trust Co. of Dallas and Mr. Ford was executive vice president of that bank. A Mr. Hoover, who also was in on the discussions with respect to the loan, was a business associate of Mr. Ford. From the proceeds of the $150,000 loan, $105,000 was to go to Gulf Continental, Inc., and its major stockholders, Mr. Swords, Mr. C. F. Leatherwood, and Mr. Gardner. Of this amount, $5,000 was to be retained by Mr. Burrows for his services and exposure as the signer of the note and $40,000 was to go to Mr. Ford and Mr. Hoover for their services in the transaction as well as other services they had performed for the corporation. It was understood that at some time and in some form the recipients of the funds from the $150,000 loan might be called upon to repay some of the funds but, in the meantime, the individuals to whom the funds were dispersed had the use of the money. On May 9, 1969, Mr. Burrows executed a note for $150,000 to the First State Bank of Aransas Pass, Texas, secured by stock of *208 Gulf Continental, Inc. The note carried an interest rate of 7-1/2 percent per annum. After this note was executed, the First State Bank of Aransas Pass went into liquidation and its assets were taken over by the Federal Deposit Insurance Corporation (FDIC), Liquidation Division. On November 4, 1969, Mr. Burrows renewed the note executed to the First State Bank of Aransas Pass, Texas, with the FDIC, Liquidation Division, at 10 percent interest per annum secured by the same Gulf Continental, Inc., stock which had secured the note to the First State Bank of Aransas Pass. The following schedule shows the payments made on the note executed by Mr. Burrows on May 9, 1969, and renewed with the FDIC on November 4, 1969: Total
Payment
Payment
Payment
Applied to
Applied to
Principal
Received
Interest
Principal
Balance 9- 2-69 Inventory Balance
$150,000.00
11- 6-69 Payment
$9,833.32
$4,833.32
$5,000.00
145,000.00
12- 5-69 Payment
6,208.34
1,208.34
5,000.00
140,000.00 1- 7-70 Payment
6,166.60
1,166.60
5,000.00
135,000.00 2- 9-70 Payment
6,125.00
1,125.00
5,000.00
130,000.00 3- 9-70 Payment
6,100.00
1,100.00
5,000.00
125,000.00 4- 9-70 Payment
6,000.00
1,000.00
5,000.00
120,000.00 5-11-70 Payment
5,986.30
986.30
5,000.00
115,000.00 6-12-70 Payment
5,874.30
1,103.99
4,770.31
110,229.69 6-24-70 Wire charge
110,229.69 7-13-70 Payment
5,744.30
936.21
4,805.61
105,424.08
Balance at
Termination
$105,424.08
*209 Sometime after 1972, Gulf Continental, Inc., filed for a reorganization under chapter 11 of the Bankruptcy Act and subsequently went into bankruptcy. A final settlement was made on the note of Mr. Burrows by means of a court ordered settlement on January 5, 1979, for $5,000. On May 30, 1969, Mr. Gardner deposited or caused to be deposited in his bank account no. XX-X714-3 at the Exchange Bank & Trust Co. of Dallas, Texas, an amount of $105,000. This $105,000 was a part of the proceeds of the $150,000 note which had been executed by Mr. Burrows and was the $105,000 which it was agreed would go to Gulf Continental, Inc., and certain of its stockholders. From the deposit on May 30, 1969, of the $105,000 made to Mr. Gardner's bank account at the Exchange Bank & Trust Co. of Dallas, the following disbursements were made: Disbursements
Amounts
David Hoover
$38,000.00
David Hoover
3,599.00
Lewisville State Bank,
note payment
25,833.00
C. F. Leatherwood
7,261.58
C. F. Leatherwood
5,000.00
Total  $79,693.58
The remaining $25,306.42 represented the $25,000 that was to be Mr. Gardner's portion of the loan and the $306.42 was money he was to use for some *210 miscellaneous expenses. Although Mr. Gardner as vice president and general counsel of Gulf Continental, Inc., drew no salary from the corporation, he was to be paid for his work of arranging the merger and the public offering of stock of the corporation when the work was finished. He also made an exchange of some royalties he had from property in west Texas for stock in the corporation. Mr. Swords and Mr. C. F. Leatherwood agreed to assist Mr. Gardner in obtaining some loans to tide him over until the work of merging the corporations and putting the stock of the merged company on the public market was completed. The stock of Gulf Continental, Inc., performed very well on the market until 1972. At some time in late 1969 or early 1970, Mr. Swords had a heart attack and died and Mr. Gardner succeeded him as president of Gulf Continental, Inc. As president, beginning in 1970 Mr. Gardner was receiving a salary of $1,200 a month. However, he did not always withdraw that salary. There was a running account between Mr. Gardner and Gulf Continental, Inc., which was audited by the public accountants that audited the books of Gulf Continental, Inc. On June 9, 1970, Mr. Gardner had *211 a cashier's check on the South Oak Cliff Bank, Dallas, Texas, drawn to the order of Mr. Ford in the amount of $3,000. Mr. Gardner furnished the funds for this cashier's check. This money was given by Mr. Gardner to Mr. Ford with the understanding that Mr. Ford would use it to pay on the $150,000 note of Mr. Burrows to the FDIC. In addition, Mr. Gardner gave Mr. Ford two cash amounts, one of $3,300 and another of $2,800 with the understanding that they would be applied toward payment of the $150,000 note. This $9,100 was the total amount directly given by Mr. Gardner to Mr. Ford to be used in payment on the $150,000 note. However, after Mr. Gardner became president of Gulf Continental, Inc., he drew two checks on the account of that company in the amount of $5,000 each which he gave to Mr. Ford with the understanding that Mr. Ford would use them in payment of the $150,000 note. The only sum that Mr. Gardner either personally or through drawing of checks on Gulf Continental, Inc., gave to Mr. Ford to be paid toward the $150,000 note was this $19,100. During the years 1967 through 1972, Mr. Gardner provided support for Mrs. Gardner. However, Mrs. Gardner had some small amount *212 of income in most of these years which she derived from modeling. At various times during the years 1967 through 1972, Mrs. Gardner inquired of Mr. Gardner with respect to the filing of their Federal income tax returns. The records necessary for Mr. and Mrs. Gardner to file their Federal tax returns for the years 1967 through 1972 were in the possession of Mr. Gardner. For the years 1956 through 1966, Mr. and Mrs. Gardner had filed joint Federal income tax returns which they both signed. Although Mr. and Mrs. Gardner were not divorced until 1979, they were from time to time separated during the years prior to 1979. Mr. Gardner discussed with both Mrs. Gardner and her attorney during the years 1967 through 1972 the fact that he was attempting to get information together to file Federal income tax returns. Although he discussed financial problems with her generally, and particularly personal finances, Mr. Gardner never furnished Mrs. Gardner with specific financial information from which to file a Federal tax return. Respondent in his notice of deficiency to Mr. Gardner determined that the $25,306.42 of unexplained bank deposits to his account was community income of Mr. and *213 Mrs. Gardner. On this basis, he determined that one-half of the $25,306.42 was income to Mr. Gardner and one-half to Mrs. Gardner. A separate deficiency notice was sent to each of them. It was in these notices that respondent also determined the additions to tax for failure to timely file returns, negligence, and for the year 1969 an addition to tax against Mrs. Gardner under section 6654 for failure to file an estimated tax return or pay estimated tax. OPINION The major issue in this case is purely factual. The record is completely clear that the $25,306.42 which Mr. Gardner kept out of the $105,000 deposited in his bank account for his own use was income to him unless, as he contends, it was a loan to him. Mr. Gardner's exact words in explaining his receipt of the $25,306.42 in his testimony were: "and $25,000.00 was to be my portion of the loan that I could utilize. And I took $25,000.00 out of the account * * *." He further testified with respect to the $150,000 loan which was arranged with Mr. Burrows as follows: "Now, this loan transaction was to be partially for the benefit of the control stockholders and partially for the benefit of the corporation." Again, he stated *214 "$105,000.00 was to be realized by the Gulf Continental Group, that would be Mr. Swords, Mr. Leatherwood and myself and Gulf Continental, Inc." Again, he stated "All of this was to be in the form of a loan. Every man had to pay his money back. But we had the use of this money." Mr. Gardner's testimony with respect to the transaction from which he obtained $25,306.42 shows that that amount was subject to his control and use in 1969. The actual transaction was clearly a loan to Mr. Burrows, secured by Gulf Continental, Inc., stock. We interpret Mr. Gardner's testimony to be that the stock put up as security for this loan had been contributed as capital by the various stockholders including Mr. Gardner to Gulf Continental, Inc. From this record, it is far from clear to what extent, if any, the $25,306.42 was to be repaid by Mr. Gardner and to whom such repayment was to be made. The overall impression we get from the record is that the $150,000 was intended to be repaid by Gulf Continental, Inc., but that the stockholders who drew a part of the funds from the loan for their own use agreed in effect to be liable for the loan to the extent of their drawings if Gulf Continental, *215 Inc., was unable to repay the amount. There is no direct testimony to this effect in the record because Mr. Gardner insisted that he was liable to repay the $25,000 that he took from the proceeds of the loan. In explaining why he never paid the final $6,000-plus of the $25,306.42 he had received from the deposit to his account, Mr. Gardner testified-- I was endorser on the corporate debts [Gulf Continental, Inc.].No. [sic] Inasmuch as I am still having to pay on these, possibly, I don't know there are several thousands of dollars -- over $100,000.00. In my mind, I treated that discontinuing obligation as a complete -- more than a complete payment of any obligation I might have had to Gulf for the remaining $6,000.00 or so on that note. From this testimony, we gather that Mr. Gardner considered that he had some obligation to repay Gulf Continental, Inc., for the $25,306.42 rather than being obligated to pay the amount on the note given by Mr. Burrows. In , the Court stated with respect to amounts acquired to which a taxpayer had some claim of right as follows: When a taxpayer acquires earnings, lawfully *216 or unlawfully, without the consensual recognition, express or implied, of an obligation to repay and without restriction as to their disposition, "he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent." North American Oil Consolidated v. Burnet, supra, 286 U.S. at page 424, 52 S.Ct. at page 615. In such case, the taxpayer has "actual command over the property taxed--the actual benefit for which the tax is paid," Corliss v. Bowers, supra [281 U.S. 376, 50 S.Ct. 336]. This standard brings wrongful appropriations within the broad sweep of "gross income"; it excludes loans.* * * In this case, petitioners have failed to show that Mr. Gardner had a primary unconditional obligation to repay any of the $25,306.42. At most he had some form of secondary obligation to pay Mr. Ford or Mr. Burrows if Gulf Continental, Inc., defaulted on its obligation. Under these circumstances, petitioners have failed to show that the $25,306.42 was not income to them in 1969. We do not have before us the year 1970 of Mr. Gardner or any *217 issue with respect to Mrs. Gardner's income for that year. Therefore, we need not consider whether the $9,100 payment to Mr. Ford would affect petitioners' 1970 income. [2]
The parties agree that if the $25,306.42 is income received by Mr. Gardner in 1969, it is community income taxable equally to Mr. and Mrs. Gardner. The only attempt that Mr. Gardner made to explain his failure to file tax returns for the years 1967 through 1972 was that he was an alcoholic at that time. This explanation obviously fails with respect to the years 1971 and 1972 since Mr. Gardner further testified that he took the last drink he ever took on September 15, 1971. However, Mr. Gardner made no showing that his alcoholism was sufficiently extensive in the years prior to 1971 to excuse his failure to file returns in any year. Since he was capable of being vice president and general counsel of Gulf Continental, Inc., in 1969 and its president in 1970, he certainly was capable of filing tax returns. We therefore sustain *218 respondent's determination of the additions to tax for failure to file timely returns for the year 1969 and for negligence against Mr. Gardner. Mrs. Gardner did not testify at the trial. There is no explanation on her part of why the addition to tax for negligence under section 6653(a) as determined by respondent for each of the years here in issue should not be sustained.Mr. Gardner did testify that Mrs. Gardner asked him for information about tax returns and that he told her that the returns were not filed. Although Mr. Gardner may have had all the information needed to file tax returns for himself and Mrs. Gardner, this fact does not excuse Mrs. Gardner for not filing a return on the best basis she could. She knew of her obligation to file returns because she had in prior years filed joint returns with Mr. Gardner. Also, Mr. Gardner referred to speaking with Mrs. Gardner and her attorney. Clearly Mrs. Gardner was aware of her duty to file tax returns and, the fact that Mr. Gardner had most of the information needed for these returns, does not excuse her for failure to file at all. We therefore sustain respondent's determination against Mrs. Gardner of the addition to tax *219 for failure to timely file her tax return for the year 1969 and for negligence for each of the years 1967 through 1972. There is nothing in the record to show any error on respondent's part in his determination of an addition to tax under section 6654 against Mrs. Gardner for the year 1969. We therefore sustain that determination. Decisions will be entered for the respondent.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years here in issue.↩
2. Petitioners do not contend even in the alternative that sec. 1341 is applicable here. Also, Mr. Gardner did not explain for whose "miscellaneous expenses" the $306.42 was used.↩